IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID McARTHUR, | ) | CASE NO. 1:07 cv 1560 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff David McArthur's application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court REVERSES and REMANDS the decision of the Commissioner for further proceedings not inconsistent with this decision.

## I. PROCEDURAL HISTORY

On September 10, 2003, Plaintiff filed an application for Disability Insurance benefits and Supplemental Security Income benefits, alleging a disability onset date of April 25, 2003 due to limitations related to neck, shoulder, back, and left leg pain. On April 24, 2006,

1

Administrative Law Judge ("ALJ") Jeffrey Hatfield determined Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work and, therefore, was not disabled (Tr. 22-24). On appeal, Plaintiff claims the ALJ's determination is not supported by substantial evidence.

## II. <u>EVIDENCE</u>

### A. Personal and Vocational Evidence

Born on October 24, 1961 (age 44 at the time of the ALJ's determination), Plaintiff is a "younger individual." *See* 20 C.F.R. §§404.1563, 416. 963. Plaintiff completed the twelfth grade, obtained an Associates degree in electronics, and has past relevant work as a nursing assistance, bench technician, and PC board assembler (Tr. 82, 109, 134, 444-48).

### B. Medical Evidence

In December 2002, a thoracic spine x-ray showed mild intervertebral disc space narrowing at T9 with hypertrophic change (Tr. 317). In April 2003 and July 2003, Plaintiff went to the emergency room for a thoracic region sprain (Tr. 402-08). Dr. Hughes continued to see Plaintiff throughout 2003 and 2004 for back and shoulder pain complaints, and he received several courses of physical therapy and prescription medications (Tr. 203-30, 278-83, 290-94, 298-302, 309-14). Generally, physical examinations noted back and neck tenderness and muscle spasm, but Plaintiff had full range of motion, negative straight-leg raising, and normal muscle strength, sensation, and reflexes (Tr. 203-30, 278-83, 290-94, 298-302, 309-14). On May 20, 2003, Dr. Hughes noted a grinding sensation evident in both of Plaintiff's shoulders and Plaintiff was given a shoulder injection to help resolve the pain (Tr. 310).

In May 2003, Paul Marin, D.O., noted that Plaintiff initially injured his back, neck, and left hand at work in August 1997 (Tr. 196-97).  There was a questionable loss of consciousness, but when treated at a medical center, x-rays were negative; the left hand was sutured (Tr. 196).  Plaintiff had two follow-up visits, but lost no work days and received no therapy (Id.).  Plaintiff complained of continued neck, low back, and hand pain (Id.).  On examination, Plaintiff had tenderness and muscle spasticity from C1 to C7 with mildly reduced lumbar range of motion (Id.).  Plaintiff had straight-leg raising at 60 degrees bilaterality, but neurologically was intact (Tr. 197).  Dr. Martin assessed Plaintiff as having 15 percent whole person permanent partial impairment as defined by the AMA guidelines (Id.).

In August 2003, Dr. Hughes completed a State Agency form regarding Plaintiff's physical abilities, noting that Plaintiff had chronic lower back pain and left shoulder sprain (Tr. 200).  He opined that Plaintiff's standing, walking, and sitting were not affected by these impairments, but Plaintiff could only frequently lift and/or carry up to five pounds and occasionally lift and/or carry six to ten pounds (Tr. 201).  Plaintiff had markedly limited pushing/pulling and moderate limitation in bending (Id.).  The physician noted that Plaintiff was taking medication and going to physical therapy for his back and shoulder, and concluded that Plaintiff was employable (Tr. 202).

That same month, August 2003, the Bureau of Worker's Compensation assessed Plaintiff with a five percent permanent partial disability, which entitled him to an award of compensation for a period of ten weeks (Tr. 272).

Dr. Hughes completed a State Agency mental functional capacity assessment in June 2003, and opined that Plaintiff was moderately limited in his ability to understand, remember,

and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual with customary tolerances; and work in coordination with or proximity to others without being distracted by them (Tr. 198). The physician noted that Plaintiff had trouble answering questions about his history and had arrived late for a couple of appointments (Tr. 199). Dr. Hughes concluded, however, that Plaintiff was employable (Id.).

Plaintiff first sought mental health treatment at the Neighboring Clinic in January 2004 (Tr. 392-94). At his initial evaluation, Plaintiff reported being referred to the clinic by his extended housing worker at Project Hope, where he was currently living (Tr. 393). He had difficulty explaining why he was at the clinic, but relayed that he had a stressful childhood, long-standing family conflicts, was a loner, and did not trust people very much (Tr. 392-93). He had never been psychiatrically hospitalized, but saw a counselor once when he was going through a divorce (Tr. 392). Plaintiff said that he had not used recreational drugs in the last five years (Tr. 393). Nurse Kate Proehl, N.D., R.N., C.S., described Plaintiff as a poor historian with vague and tangential speech and poor eye contact (Tr. 392, 394). His affect was constricted and mood was euthymic (Tr. 394). Thought process was somewhat disorganized and he seemed rather guarded (Id.). Nurse Proehl assessed a provisional diagnoses of schizotypal personality disorder versus schizoid personality disorder with a remote history of polysubstance abuse (Id.). Nurse Proehl did not recommend medications at that time, but instructed Plaintiff to return in one month for a follow-up (Id.).

At his first follow-up visit in February 2004, Nurse Proehl recommended Plaintiff try Zyprexa for his symptoms (Tr. 391). A second progress note, two weeks later, noted Plaintiff

reported that he felt better at half of the recommended Zyprexa dose and he told the nurse that his temper was better, he was calmer, his thoughts were more organized, and he was sleeping better (Tr. 390).   Plaintiff continued to seek mental health treatment at the clinic through December 2005 (Tr. 375-91, 407-11).   Nurse Proehl noted Plaintiff's disheveled appearance, irrelevant speech, poor reasoning and judgment, and opined that Plaintiff was moderately to markedly ill (Tr. 375-390, 408-11).

Kenneth R. Felker, Ph.D., performed a consultative psychological evaluation in January 2004 and the request of the State Agency (Tr. 255-60).   Plaintiff reported being homeless, having restless and intermittent sleep and had physical back pain on a daily basis (Tr. 256-57).   He admitted to a history of substance abuse, which ceased in 1981 (Tr. 256).   He continued to drink alcohol, but felt that his use was not problematic (Id.).   Plaintiff denied a history of crying spells or suicidal ideation (Id.).   On examination, Plaintiff had satisfactory rate and volume of speech and "fine" eye contact; but he acknowledged that he had mild depression and anxiety (Id.).   Plaintiff was oriented to person, place, and time, but concentration and ability to attend to tasks were restricted (Tr. 257).   His insight and judgment were fair (Id.).   Dr. Felker assessed depression, not otherwise specified, and polysubstance dependence, in partial remission (Tr. 259).   The psychologist opined Plaintiff had mild to moderate restriction in his ability to concentrate and attend tasks and in his ability to understand and follow routine instructions and carry out one and two-step tasks (Tr. 258).   His ability to relate to others and deal with the general public was mildly to possibly moderately restricted and his ability to relate to work peers, supervisors, and deal with workplace stressors was moderately impaired (Tr. 259).

Karen Steiger, Ph.D., reviewed the medical evidence at the state's request in February 2004 (Tr. 261-69).  Dr. Steiger considered Plaintiff's allegations of anxiety and depression, his reports of his daily activities, and Dr. Felker's consultation report (Tr. 263).  Dr. Steiger assessed Plaintiff as having mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace (Tr. 268).  She concluded that Plaintiff was capable of understanding, remembering, and carrying out simple and multi-step tasks and instructions in work settings that did not require sustained social interaction, and did not have strict production quotas or pressures to perform rapidly throughout the work day (Tr. 263).

In October 2004, Dr. Hughes noted that a review of Plaintiff's past medical history indicates simple schizophrenia and noted that Plaintiff was taking Zypreza (Tr. 278).  In July and August 2004, Plaintiff underwent a work evaluation through Vocational Guidance Services (Tr. 168-77).  The Valpar Component Work Samples testing resulted in an overall work speed of 56 percent, placing Plaintiff's performance at the sheltered level of employment (Tr. 172).  Plaintiff's overall work accuracy score of 48 percent placed his performance below criteria established for competitive employment (Id.).  It was noted Plaintiff demonstrated difficulty sustaining concentration, attending to details, and attending to tasks, requiring repeated cuing and prompts to refocus attention (Tr. 175-76).

M.P. Patel, M.D., saw Plaintiff in February 2005 for a medical impairment evaluation of Plaintiff's thoracic region sprain work-related injury, which occurred in August 1997 (Tr. 372).  Plaintiff reported neck stiffness and pain, and examination revealed tenderness, spasm, and some decreased range of motion (Tr. 373).  When Plaintiff returned to Dr. Patel's office in April 2005,

Plaintiff reported left hand swelling and pain, which extended to his let wrist joint, causing weakness in grip strength (Tr. 368).  He also reported constant neck pain, which caused difficulty turning his neck, and constant low back pain, which caused difficulty with bending, lifting, standing or walking for extended periods of time, and climbing or descending stairs (Tr. 369).  Examination revealed a left hand scar, tenderness to palpation, and mildly decreased left hand-wrist joint mobility (Id.).  Plaintiff had muscular tenderness and tightness along his cervical spine and decreased neck flexion, but deep tendon reflexes were generally normal (Id.).  The lumbosacral spine had tenderness with spasm (Tr. 370).  Plaintiff had mildly reduced flexion and extension and mildly reduced knee and ankle reflexes (Id.).  Straight-leg raising produced low back pain at 45 degrees (Id.).  Dr. Patel assessed Plaintiff as having a total of 20 percent permanent partial impairment under the workman's compensation standards (Id.).

In July 2005, Dr. Hughes completed a mental capacity assessment at the request of Plaintiff's representative (Tr. 395-97).  The physician assessed Plaintiff as having mostly poor or no ability to make occupational adjustments, function intellectually, or make personal or social adjustments (Tr. 396-97).  Plaintiff had good ability to maintain appearance or leave home on his own, and fair ability to follow work rules, maintain regular attendance, deal with the public, socialize, and manage funds or schedules (Tr. 397).

In January 2006, Dr. Hughes saw Plaintiff for back complaints (Tr. 430-31).  Examination revealed lower thoracic and lumbar spine tenderness and a grinding sensation in the left shoulder with abduction (Tr. 430).  The physician recommended back exercises, continued Plaintiff's medications, and considered referral to a pain clinic for evaluation and consideration of injections (Id.).

**C. Hearing Testimony**

Plaintiff testified at the hearing that he took pain medication for his back and shoulder symptoms, which did not completely eliminate his symptoms (Tr. 450).  Plaintiff had difficulty climbing stairs (Tr. 452).  Plaintiff had difficulty with concentration and memory, and he received counseling and medication for his psychological symptoms (Tr. 453-54).

Plaintiff was terminated from his PC board assembler job in April 2003 due to poor performance (Tr. 445-46).  He testified that he had some problems working with his supervisor (Tr. 461).  A court recently awarded Plaintiff custody of his infant son (Tr. 443-44).  Plaintiff could cook easy meals and do a little house cleaning and laundry (Tr. 451-52).  Plaintiff grocery shopped with a friend, volunteered on Fridays stuffing and mailing envelops, and went to his counseling appointments on his own (Tr. 455-57).  Plaintiff also attended community college two full days a week in pursuit of an Associate's degree in paralegal studies (Tr. 457).  Plaintiff could sit through a 45-minute class, but then needed to stretch his back (Tr. 458).

Frank Cox, M.D., who is board certified in internal medicine, testified as a medical expert at the hearing (Tr. 462-74).  Dr. Cox testified that, with respect to Plaintiff's physical complaints, no hard, objective evidence existed to support his alleged symptoms (Tr. 464).  He noted Dr. Hughes's clinical finding of mild tenderness at T10, but noted that there was no evidence of neurologic deficits, and there was active and passive range of motion in the shoulders (Tr. 465).  Although a December 2002 thoracic x-ray showed disc space narrowing at T9, this record pre-dated Plaintiff's April 2003 onset date (Tr. 468-69).  The ME noted that the T9 disc in the thoracic region would not cause or support Plaintiff's claim of alleged back pain (Tr. 469).  The ME also considered Dr. Patel's report for the worker's compensation claim,

noting some concerns about the findings in his exam (Tr. 471-73). The ME concluded that Plaintiff's alleged impairments did not, in combination, meet or equal a Listing (Tr. 474).

With respect to Plaintiff's mental condition, the ME testified that he was hesitant to give an opinion given his medical background and the diagnosis of schizophrenia, but noted the consultative examination, the nurse's diagnoses, and progress notes from the Neighboring Clinic (Tr. 466-68).

Vocational expert ("VE") Mark Allan Anderson also testified at the hearing (Tr. 474). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who retained the residual functional capacity ("RFC") for the following: frequently lift and carry up to twenty pounds; occasionally lift and carry up to forty pounds; frequently push and pull with both extremities; stand/walk and sit for six hours in an eight-hour workday at one-hour intervals; never climb ladders, ropes, or scaffolds; never work around heights, moving machinery, or hazards; only occasionally reach in all directions; and do only simple repetitive tasks which are low stress with no production quotas and which require only minimal interaction with the public and coworkers, only occasional decision making, only occasional use of judgment, and only occasional changes in work setting (Tr. 477-78). The VE responded that such a hypothetical individual could not perform Plaintiff's past work, but retained the ability to perform the jobs of shipping and receiving weigher (1,500 in northeast Ohio), blending tank tender (1,000 in northeast Ohio), and laminating machine tender (less than 100 in northeast Ohio) (Tr. 480-81). During cross-examination, Plaintiff's representative asked the VE whether Valpar testing is an accepted measure of a person's ability to perform work activities and the VE responded that the Valpar test was a "very good system" (Tr. 483-84).

### III.  **DISABILITY STANDARD**

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV.  **STANDARD OF REVIEW**

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  <u>ANALYSIS</u>

### A.  The ALJ's Treatment of Plaintiff's Treating Doctors

Plaintiff first argues the ALJ failed to explain the weight he assigned to the opinions of Dr. Hughes, Plaintiff's treating physician, regarding Plaintiff's physical impairments.  Defendant argues that the weight the ALJ gave to Dr. Hughes's opinions is clear, based on the ALJ's RFC findings, and thus any articulation error by the ALJ would be harmless.  Defendant's argument is not well taken.

The weighing of medical evidence is the province of the Commissioner.  Where there are conflicting medical opinions resulting from essentially the same objective medical data, it is the responsibility of the ALJ to resolve those conflicts. *See Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990); *see also Bradley v. Secretary of Health & Human Servs.*, 862 F.2d 1224, 1227-28 (6th Cir. 1988).  The ALJ, however, is bound by the Social Security Regulations when doing so. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544, 545 (6th Cir. 2004).  The regulations clearly require a treating physician be given controlling weight should his opinion be well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2).  Indeed, the opinion of a treating physician is afforded greater weight than those of physicians who have examined the claimant on consultation or who have not examined the

11

claimant at all. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)*; Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). Although the regulations ensure an ALJ is not bound by the opinion of a claimant's treating physician, if he chooses to reject said opinion, the ALJ must articulate a good reason for doing so. *See Shelman*, 821 F.2d at 321. Specifically, if a treating source is not accorded controlling weight, the ALJ must apply certain factors – the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. Even still, the reasons offered for a credibility determination need not only comply with these factors, they must also be "good." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 545. Indeed, courts have consistently remanded Commissioners' decisions when they have failed to articulate "good reasons" for not crediting the opinion of a treating source as required by 20 C.F.R. § 404.1527(d)(2). *Id.*; *see also Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

The evidence reflects that Dr. Hughes treated Plaintiff periodically from 2002 to 2006. During 2003 and 2004, Plaintiff saw Dr. Hughes for back and shoulder complaints and was treated with physical therapy and medication. In May and June 2003, Dr. Hughes noted Plaintiff had full motor strength in his extremities and full range of motion, but Plaintiff continued to have pain and was given a shoulder injection (Tr. 295, 299). In June 2003, Dr. Hughes completed an evaluation of Plaintiff's physical limitations and concluded that Plaintiff could sit, stand and walk without limitation (Tr. 201). Dr. Hughes concluded Plaintiff could frequently lift up to five pounds and occasionally lift up to ten pounds, and was markedly limited in

pushing/pulling, and moderately limited in bending (Id.).  As evidence and/or observations to support his conclusions, Dr. Hughes stated that Plaintiff had persistent shoulder and lower back pain for which he took medication and went to physical therapy (Id.).  In October 2004, Plaintiff continued to complain of pain in the shoulders and back (Tr. 278).  Dr. Hughes noted that Plaintiff had completed multiple physical therapy sessions, but he had reached a plateau and so physical therapy would not be repeated (Tr. 279).  Dr. Hughes continued Plaintiff's medications of Ibuprofen and Flexural (Id.).

The ALJ concluded Plaintiff can perform work that does not involve lifting and carrying more than forty pounds occasionally and twenty pounds frequently; more than frequent pushing/pulling with the left upper extremity; sitting, standing and walking for more than 6 hours a day, one hour at a time; more than occasional reaching; the climbing of ladders, ropes and scaffolds; and work around heights, hazards or moving machinery (Tr. 23).  It is clear from the ALJ's RFC assessment that he rejected Dr. Hughes's opinion that Plaintiff can only lift up to ten pounds, is markedly limited in pushing/pulling, and moderately limited in bending. However, despite the fact that Dr. Hughes has treated Plaintiff for his back and shoulder problems for over four years, the ALJ provides no explanation whatsoever for rejecting Dr. Hughes's conclusions as to Plaintiff's physical limitations.  Given the large disparity between the ALJ's RFC assessment and Dr. Hughes's conclusions, the Magistrate Judge cannot conclude that the ALJ's failure to provide good reasons for rejecting Dr. Hughes's conclusions amounts to harmless error.  The social security regulations require an ALJ to articulate good reasons for rejecting the opinion of a treating physician. *See Shelman*, 821 F.2d at 321.  Moreover, when a treating physician's opinion is not accorded controlling weight, the ALJ must apply certain

factors, including the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source, in determining what weight to give to the treating physician's opinion. 20 C.F.R. § 404.1527(d).  Although the ALJ in this case did not accord controlling weight to the opinion of Plaintiff's treating physician, he failed to apply these factors and failed to articulate what weight he assigned Dr. Hughes's opinion.  The ALJ's failure to articulate "good reasons" for not crediting Dr. Hughes's opinion as required by 20 C.F.R. § 404.1527(d)(2) warrants remand.

Plaintiff also claims the ALJ erred by failing to articulate the weight he assigned to Dr. Hughes's opinions regarding Plaintiff's mental impairments.  The record shows that Dr. Hughes completed a mental capacity assessment in June 2003 and assessed moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, working in coordination with or proximity to others without being distracted, and understanding, remembering, and carrying out detailed instructions (Tr. 198).  Dr. Hughes noted that Plaintiff had trouble answering questions and arrived late for a couple of his appointments (Tr. 199).  In July 2005, Dr. Hughes completed another assessment of Plaintiff's mental limitations and conncluded Plaintiff has a fair ability to follow work rules, maintain regular attendance, deal with the public, socialize, and manage funds or schedules (Tr. 396-97).  He concluded Plaintiff had poor or no ability to deal with work stresses, complete a normal workday and week without interruptions, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out complex, detailed or simple job instructions (Id.).

The ALJ noted Dr. Hughes's June 2003 and July 2005 evaluations (Tr. 17).  The ALJ concluded Plaintiff retained an RFC to perform work in a low stress environment with simple, repetitive tasks and no production quotas, with no more than minimal interaction with the public or coworkers, and with no more than occasional use of judgment, decision making, and changes in work setting (Tr. 477-78).  It appears the ALJ's RFC determination accommodates most of the non-exertional restrictions assessed by Dr. Hughes, except for the limitation that Plaintiff has poor or no ability to understand, remember, and carry out even simple instructions.  The ALJ gave no reason for rejecting this part of Dr. Hughes's opinion.  However, even if a physician is classified as a treating physician, his opinion may be afforded little weight if the Plaintiff fails to show his impairments are supported by contemporaneous, objective clinical or diagnostic findings. *See Ladwig v. Comm'r of Soc. Sec.,* No. 00-6585, 2002 WL 1491872 (6th Cir. July11, 2002)(unpublished); *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 538 (6th Cir. 1993); *Landsaw v. Secretary of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).  The record shows that Dr. Hughes is a specialist in internal medicine who treated Plaintiff for his physical complaints of back and shoulder pain.  Dr. Hughes's records do not contain any objective or clinical findings with respect to Plaintiff's mental impairments.  Dr. Hughes's records do not contain any reference to Plaintiff mental complaints or problems, aside from one record that notes a past history of schizophrenia and that Plaintiff was taking Zyprexa.  It appears Dr. Hughes's June 2003 evaluation was completed at the request of Lake County Department of Job and Family Services and his July 2005 evaluation was completed for the purpose of Plaintiff's social security benefits application (Tr. 198, 395-96).  Thus it appears that Dr. Hughes did not treat Plaintiff for his mental impairments and thus, does not qualify as a treating source with

15

respect to Plaintiff's mental impairments.  Even if Dr. Hughes qualifies as a treating source with respect to Plaintiff's mental impairments, he did not provide any objective clinical or diagnostic findings to support his conclusions regarding Plaintiff's mental impairments. Accordingly, the ALJ's failure to articulate a reason for rejecting Dr. Hughes's conclusion that Plaintiff cannot understand, remember, and carry out even simple instructions, does not provide a basis for remand.

### B. The ALJ's Treatment of Evidence from "Other Sources"

Plaintiff next argues the ALJ erred by failing to give reasons for ignoring the opinion of Plaintiff's treating mental health professional, Kate Proehl, N.D., R.N., C.S.  In her records, nurse Proehl noted Plaintiff's poor eye contact, disorganized thought process, eccentric behavior, memory deficits, poor problem solving, and strange, irrelevant, slow and tangential speech (Tr. 375-91, 94, 408-11).  Nurse Proehl opined that Plaintiff was moderately to markedly ill (Tr. 376, 378, 380, 382, 384, 386-87, 409, 411).  The ALJ noted nurse Proehl's records, which showed a provisional diagnoses of schizophrenia, remote history of polysubstance abuse, eccentric personality, tangential thought processes and speech, mildly depressed mood, and social awkwardness (Tr. 18-19).  The ALJ noted the ME's testimony that the provisional diagnoses of schizophrenia was made by a nurse practitioner, not Plaintiff's physician (Tr. 19).

The ALJ is required to consider all of the available evidence in an individual's record, which may include information provided by "other sources."  Evidence from "other sources" consists of evidence from sources such as nurse practitioners, physicians' assistants, chiropractors, therapists, educational personnel, public and private social welfare agency personnel and other non-medical sources (for example, spouses, parents, friends, and clergy). 20

16

C.F.R. § 404.1513(d)(1).  The social security regulations provide that an ALJ may use evidence from "other sources" to show the severity of a claimant's impairment and how it affects his ability to work. *Id.*  Evidence from "other sources" is not provided by an acceptable medical source, and thus is not subject to the treating physician rule. *See Craig v. Comm'r of Soc. Sec.*, No. 97-3721, 1997 U.S. App. LEXIS 15536 (6th Cir. 1997); 20 C.F.R. § 404.1527(d)(2).

Based upon the above, the record reflects that the ALJ considered the records from nurse Proehl.  Nurse Proehl's records constitute evidence from "other sources" under 20 C.F.R. § 404.1513(d)(1), and thus, are not subject to the treating physician rule.  Accordingly, the failure of the ALJ to explain what weight, if any, he assigned to nurse Proehl's opinion does not provide a basis for remand.

### C. The ALJ's Treatment of Plaintiff Vocational Work Evaluation

Plaintiff also argues that the ALJ failed to address his work evaluation at Vocational Guidance Services, which revealed he had difficulty sustaining concentration, attending to details, and staying on task (Tr. 153-54, 175-76).  Valpar testing revealed that Plaintiff performed at the sheltered level below criteria established for competitive employment (Tr. 170).  At Plaintiff's hearing, counsel asked the VE whether Valpar testing is an accepted measure of a person's ability to perform work activities and the VE responded that Valpar testing is a "very good system" (Tr. 483-84).

The ALJ is not required to address every piece of the evidence in the record in reaching his decision.  Indeed, the Court is well aware that:

> While it might be ideal for an ALJ to articulate his reasons for crediting and discrediting each medical opinion, it is well settled that:

17

> [a]n ALJ can consider all the evidence without directly addressing
> in his written decision every piece of evidence submitted by a
> party.  Nor must an ALJ make explicit credibility findings as to
> each bit of conflicting testimony, so long as his factual findings as
> a whole show that he implicitly resolved such conflicts.

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. Feb. 9, 2006), *quoting*

*Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999).  The ALJ did not

mention Plaintiff's work evaluation at Vocational Guidance Services in his written decision.

While the ALJ is not required to mention every piece of evidence in the record, he has a duty to

consider the record as a whole. *See Hurst v. Secretary of Health & Human Servs.*, 753 F.2d 517,

519 (6th Cir. 1985) (failing to consider the record as a whole undermines the ALJ's decision).

Indeed, the ALJ cannot simply "pick and choose" evidence in the record, "relying on some and

ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*,

351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  As this case has already been remanded on other

bases, on remand, the ALJ is directed to also consider the results of Plaintiff's work evaluation at

Vocational Guidance Services, including the results of Plaintiff's Valpar testing.

### D.  The ALJ's Reliance on the Testimony of the Vocational Expert

Plaintiff next claims that substantial evidence does not support the ALJ's RFC finding

because the hypothetical question posed to the VE did not accurately reflect Plaintiff's exertional

and non-exertional limitations.

Once it is determined a claimant does not have the RFC to perform his past relevant

work, the burden shifts to the Commissioner to show the claimant possesses the capacity to

perform other substantial gainful activity that exists in the national economy. *See Foster v.*

*Halter*, 279 F.3d 348 (6th Cir. 2001)*; Cole v. Secretary of Health & Human Servs.*, 829 F.2d

768, 771 (6th Cir. 1987).  "To meet this burden, there must be a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Secretary of Health & Human Servs*., 820 F.2d 777,779 (6th Cir. 1987).  The testimony of a vocational expert in response to a hypothetical question may serve as substantial evidence of a claimant's vocational qualifications to perform certain jobs. *See id.*  However, the hypothetical question posed to a vocational expert must accurately portray a claimant's physical and mental state. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).  Should the hypothetical fail to accurately describe a claimant's physical and mental impairments, the defect is fatal to both the vocational expert's testimony and the ALJ's reliance upon that testimony. *See id*.

The ALJ asked the VE to assume an individual of Plaintiff's age, educational and vocational background, who can lift and carry forty pounds occasionally and twenty pounds frequently; stand/walk and sit 6 hours with the ability to alternate position every hour; cannot use ladders, ropes, or scaffolds; can no more than occasionally reach in all directions; can frequently push/pull with upper extremities; cannot work around hazardous machinery or at unprotected heights; and is limited to simple, routine, repetitive, low-stress work involving no more than occasional non-confrontational and non-negotiative interaction with the public and coworkers (Tr. 477-78).  The VE responded that such an individual could not perform Plaintiff's past work because it all involved frequent reaching (Tr. 479).  The VE responded that only three jobs matched these limitations with significant numbers, including shipping and receiving weigher (1,500 in northeast Ohio), blending tank tender (1,000 northeast Ohio), and laminating machine tender (less than 100 in northeast Ohio) (Tr. 480-81).  The Magistrate Judge has already

19

concluded that the ALJ's treatment of the opinion of Plaintiff's treating physician warrants remand.  On remand, the ALJ is also directed to consider the results of Plaintiff's work evaluation at Vocational Guidance Services.  The Magistrate Judge acknowledges that reevaluation of the evidence on remand may impact the ALJ's RFC determination.  If reevaluation of the evidence alters the ALJ's RFC determination, additional VE testimony in response to a hypothetical question accurately reflecting Plaintiff's exertional and non-exertional limitations may be necessary at that time.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this decision.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: February 5, 2008